Nov. Term,
1859.

KERTZ
v.
DUNLOP.

---

## KERTZ and Others *v.* DUNLOP.

The proprietor of city lots induced certain parties to purchase them, by representing, *inter alia*, that he had sold certain other lots in the neighborhood at a certain price, whereas, in fact, he had sold the lots for much less. *Held*, that the representation was sufficient ground for rescission of the contract.

A false representation that a street was to be laid out by *A.*, which would afford direct and convenient access to the lots, was *held* to be equally material as to subject-matter, though perhaps not sufficiently specific in its terms.

This case is distinguished from *Cronk* v. *Cole*, 10 Ind. R. 485, and *Barton* v. *Simmons*, at the present term.

APPEAL from the *Marion* Circuit Court.

PERKINS, J.—Suit to rescind a contract. Demurrer to the complaint sustained. Final judgment in favor of the defendant.

The contract sought to be rescinded was for the sale and purchase of certain lots in *Dunlop & Co.'s* subdivision of *Morris's* addition to the city of *Indianapolis*. The contract was made in *May*, 1855, and the payments for the lots ran through about two years. The complaint alleges

Monday,
December 5.

that the contract was obtained by the fraudulent represen-
tations of *Dunlop.*

The representations are thus set forth—

"The plaintiff further says, that at the time the defend-
ant sold to him the above-named lots, he, the defendant,
was engaged in selling off, in city lots, a subdivision of a
part of *B. F. Morris's* addition to the city of *Indianapolis,*
containing a large number of lots, to-wit, one hundred and
five, and had already sold a large number of said lots, and
that some of the purchasers had agreed, in their contracts
of purchase, to build houses; that the defendant, *Dunlop,*
was well acquainted with the situation of said lots, and of
their value, and of the probable improvements to be made
in said addition and subdivision; that he, the plaintiff, was
not acquainted with the value, situation, and prospective
improvement of lots in said subdivision; that the same
were in a distant part of the city from his residence; that
he was not a dealer in lots and real estate, was not ac-
quainted with the value thereof, and relied upon the repre-
sentations of the defendant in regard to the value and
prospective improvement of the lots in said subdivision;
that the defendant, at the time of, and before the sale, re-
presented to the plaintiff, in order to induce him to pur-
chase said lots, and to enhance their value in his eyes, and
to deceive and defraud him, that from twenty to twenty-
five houses would be built in said subdivision during the
years 1855 and 1856; that such was the intention of the
purchasers of said lots; that the subdivision would be set-
tled within a short time, and built up in the years 1855
and 1856; that Dr. *Lawson Abbett* intended to and would
build a large, handsome, and expensive dwelling house in
said subdivision during the year 1855. The defendant
further represented that he had sold certain lots for the
sum of 150 dollars each, in said subdivision, to Dr. *Law-
son Abbett,* when, in truth and in fact, he had sold them
for 100 dollars each; and the said defendant attempted to
induce said Dr. *Abbett* to join him in said misrepresenta-
tions, and requested him, *Abbett,* to state that said lots
were sold for 150 dollars each, instead of 100 dollars, the

true price. The defendant further represented that it was the intention of *B. F. Morris*, who is the proprietor of the land situate between the said subdivision and said city of *Indianapolis*, to open a street through his said land, during the years 1855 and 1856, and that said *Morris* had agreed with him to do the same, which street would lead directly to the lots of the plaintiff, and would afford to the purchaser of said lots a short and direct route into said city; also, other streets to intersect with the streets of the city running north and south; that said lots are situate a quarter of a mile east of the *Madison* road, and without the opening of the street first above named, by *B. F. Morris*, are inconvenient of access, and in a remote, retired situation from travel and business, and of comparatively little value. The defendant further represented, to show that said lots were in demand, that he had sold seven lots in said subdivision to one *Thomas Records*. The defendant further represented that *B. F. Morris* had agreed to open half an alley on the north side of said subdivision.

The complaint avers the utter falsity of all the defendants said representations, and charges that they were made with a full knowledge of their falsity, and for the express purpose of deluding and cheating the plaintiff, and that they produced their intended effect.

The complaint shows that the plaintiff has been sued upon the notes as they became due, and has paid; that he has offered to rescind the contract, &c., and shows, *prima facie*, a sufficient excuse for the payment and delay.

The rules of law governing the rescission of contracts are well settled. The difficult question that arises in this class of cases now is, do the facts of the given case bring it within those settled rules of law? Some of the representations alleged to have been made in this case, however they may be regarded in the eyes of honor and morality, cannot be held violations of the common law. As to some, their legally fraudulent character or otherwise, is not clear; but one of those, at least, alleged to have been made, we think, was of matter of fact and not of opinion; was in relation to a matter material in the consideration of the

contract; was relied upon, and justly, by the purchaser; and, being false, constitutes a ground of rescission.

We refer to the representations, made by *Dunlop*, that he had sold certain of the lots in the addition to certain persons, for certain prices. This representation was of matters of fact. It was not the expression of an opinion simply that those lots were worth such terms; nor was it, like the representation as to the number of houses to be erected, the assertion of future probabilities and expectations, upon which no one could rely with certainty; but it asserted that certain things had taken place—were existing facts, and they were material. What is the usual course of dealing in such matters? What are the data upon which purchasers in new and growing towns in the west form their opinions as to the value of property? They inquire, what do lots sell for in such and such localities, and who buys them; and while, if they were told that, in the opinion of the informant, lots were really worth this or that much, they would be little influenced; if told that such and such lots had actually been sold for a given sum to certain persons, they would feel that they had acquired pretty accurate information of the market value of the property. And we think the assertion was one upon which the purchaser had a right to rely. The means of knowing its truth were not equally open to both parties. *Dunlop* knew for what he had sold the lots. He had perfect knowledge. *Kertz* did not know, and could only ascertain the fact with certainty from *Dunlop* or the purchaser; but the purchaser was under no obligation to give information touching the matter, and might even be interested to give false; besides, he might not be found within any convenient time, or in any contiguous locality where he could be consulted. The rule of law should not require such trouble of a party to such a contract, in finding out whether the representation of facts made by the opposite party was true.

And here a distinction may be noticed between this case and *Cronk* v. *Cole*, 10 Ind. R. 485. There the representation was not of the sale of particular parcels, but of the

general market price, among dealers, of a commodity of universal traffic, of a commodity whose current price was in almost every newspaper, and could be ascertained at any produce house in the land, if the party did not take a newspaper, a fact we should be sorry to presume. Such, also, in character, was the case of *Barton* v. *Simmons*, at this term (1).

The representation as to the opening the street was equally material, as to subject-matter. Of this there can be no doubt.

Without such an outlet the lots could scarcely be worth much. The only doubt we have had on this representation is, as to whether it was sufficiently specific in its terms. Should *Dunlop* be estopped to deny that the agrement he had with *Morris* was one, the execution of which could be enforced? Clearly he intended that *Kertz* should so understand the agreement. This point has not been sufficiently discussed to justify its decision here. We say, as we said in *Newell* v. *Gatling*, 7 Ind. R. 147, that the complaint makes a case upon its face for a rescission; it is sufficient to put the defendant to his answer, that a trial may develope the facts. We think a careful study of *Shaeffer* v. *Sleade*, 7 Blackf. 178; *Haight* v. *Hoyt*, 19 N. Y. R. 464; *Newell* v. *Gatling*, *supra*; and the same case in 9 Ind. R. 572, and in 12 Ind. R. 118; *Hepburn* v. *Dunlop*, 3 Cond. R. 513, and the cases collected in chap. xiii., commencing on p. 604 of Rawle on Covenants of Title, and in Smith on Cont., by Rawle, top p. 221, will satisfy the mind that the case made in this complaint is not weaker than some that have been upheld.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c.

*J. Coburn*, for the appellants (2).

*H. C. Newcomb*, *J. S. Tarkington*, *J. Morrison*, and *C. A. Ray*, for the appellee (3).

(1) *Post.*

(2) After a statement of the purport of the representations, Mr. *Coburn* argued as follows:

Nov. Term,
1859.

KERTZ
v.
DUNLOP.

Were the representations of a character such as a Court will regard in cases of this kind?

They were of matters of fact as to streets, as to houses, as to contracts. An agreement to open a street or alley, or build a house, is a fact; a price of a lot sold to another person, and adjoining, is a fact; the intentions of the purchasers and owners were facts; indeed, in many cases, the intention is the great fact. See 6 Gill and Johns. 58.

They were material; for it is material that streets and alleys should be opened directly to town; that houses should be built; that improvements should go on.

They were peculiarly within *Dunlop's* knowledge. They were, as represented, calculated to deceive, and did deceive the plaintiff. *Kertz* put confidence in *Dunlop*, as he (*Dunlop*) knew, or ought to have known, more than all the world beside as to his own addition.

A gross fraud was perpetrated: not a house is built, not a street or alley opened, not a thing done. A large addition is laid out, and it is to grow and fill up, and become populous, and well built, with thoroughfares to the city— and nothing is done.

Now, did the plaintiff delay too long to offer rescission? The bargain was made in *June*, 1855. In the fall of that year, *Kertz* finding that part of *Dunlop's* representations were false, offered to rescind. In *April*, 1857, he offered again to rescind, when he had found that all of them were false, utterly and totally so.

These improvements were to be made during 1855 and 1856, and during that time the notes were maturing, *Dunlop* was suing, and the false and fradulent representations were being developed, and the fraud being confirmed.

*Kertz* had a right to wait until all of these representations were proved false.

*Kertz* could not perhaps have enjoined the collection of any one of these notes until 1857, when the time in which these improvements were to be made had expired. At any rate he was not bound to enjoin each note as it became due, but could take them all at once.

In the full and masterly discussion of the subject of frauds, in the case of *Gatling* v. *Newell*, 9 Ind. R. 574, we find the law upon which we rely, especially as to lapse of time and a restoration of the parties to *statu quo*. See, also, 9 Ind. R. 9.

In this case the land was not sold, and could be restored unincumbered to *Dunlop*. The judgments before the justices intervened; these were nothing more than payments of the notes, of which *Dunlop* cannot complain, and no third party intervened.

Perhaps if *Dunlop* had assigned the judgments, and innocent parties were interested, a Court of equity would refuse to intercede; but here the very man who perpetrates the fraud comes in and acknowledges it, but says it was so long ago, and it is now ratified by a judgment; it was dishonest, but now it is sanctified by a judgment upon default before a justice of the peace. A more astonishing, impudent argument cannot be conceived of.

In the case of *Hunt* v. *Moore*, 2 Barr, 107 (see note to Rawle on Covenants of Real Title, p. 619, and note), Justice ROYNS says, in view of a similar argument: "Can it be the law that we are to repose no confidence in each other, without being branded with the charge of folly and losing the earnings of a

lifetime. True, says the defendant, I told you a falsehood, but you ought not to have believed one word I said. Had you searched the records you would have discovered it was all untrue. I never can and never will consent that any person shall be permitted in this Court to take advantage of his own wrong."

This is the language of a judge whose moral sense as well as his sound discrimination revolted at the quiet but monstrous outrages of wily cheat. Going on further he says: "A Court of equity would lay hold of slight circumstances to release a victim to such duplicity. See, also, 6 Yerg. 108; 6 B. Mon. 23; 5 J. J. Marsh. 96; 4 How. (Miss. R.) 451; 3 Sandf. (Sup. C. R.) 526; Clark's Ch. R. 571.

Our own Supreme Court, in the case of *Peter* v. *Wright*, 6 Ind. R. 194, intimate that frauds are to be established by various circumstances which are slight in themselves. In that case, the judicial mind with a consciencious regard for honesty in dealing, seized upon every badge of fraud to wrest from the wrongdoer his ill-gotten gains. See 22 Pick. 53.

In the case of *Grundy* v. *Boyce's Executors*, 3 Pet. 210, the Court held that a series of judgments might be rendered, as in this, on installments due for land, and that in the end they might all be enjoined and set aside for fraud; in other words, it was not necessary to try the question upon each installment and create a multiplicity of suits, but that it might all be done at once. And that a misrepresentation is not susceptible of reparation in damages. The law abhors fraud, and does not permit it to purchase absolution or indulgence.

In 22 Pick. 53, it is held not to be necessary that the false representation should be the predominant feature inducing the sale; but it is sufficient if it was a motive at all inducing to the sale. If it was one of several motives acting together, and by their combined force, producing the result, it is proper to be considered.

(2) Counsel for the appellee examined the charges of fraud, in their order, as follows:

1. That *Dunlop* represented to him that from twenty to twenty-five houses would be put up in this subdivision during the years 1855 and 1856, and that such was the intention of the purchasers; that within that time the subdivision would be settled and built up. These seem rather contradictory allegations— that within two years, twenty-five or thirty houses would be built on the one hundred and five lots, and in the same time they would be fully settled and built up, and if both statements were made, it must be evident that *Kertz* did not believe and rely upon both. It is stated in the complaint, that a large number of the lots had been sold before *Kertz* bought; indeed, he says, the whole of them, and it was not an unreasonable opinion that twenty-five or thirty of them, at least, would be built upon in two years. This was a mere expression of opinion, reasonably founded, we think, and if untrue or mistaken, is no reason for rescinding the contract, for it would offer only a probability of a future advance in the price of the lots, and could not have added, at the time, to their intrinsic value. And it is stated in the complaint, that some of the purchasers of lots had agreed in their title bonds, to build houses on their lots. It was, therefore, very natural that *Dunlop* should express the belief that twenty-five or thirty houses would be erected within the period stated.

2. That *Lawson Abbett*, who had purchased some of the lots, intended to

build a large and expensive dwelling house thereon in 1855. What particular advantage this would have been to *Kertz*, he does not inform us.

3. That *Dunlop* represented he had sold certain lots to *Abbett* for 150 dollars each, when, in fact, he had sold them for but 100 dollars. He does not intimate that *Abbett's* lots were not worth 100 dollars each, which was 10 dollars more than he (*Kertz*) was to pay, so that the most that can be made of that allegation is, that *Kertz* was disappointed in making a speculation of 60 dollars per lot, and not that they were worth less than he paid. That this is no ground for relief, see *Cronk* v. *Cole*, 10 Ind. R. 489, and cases there cited.

4. That *Dunlop* represented that it was the intention of *B. F. Morris* to open a street from said subdivision through his land to the city; and that *Morris* had agreed with *Dunlop* to do so; and that he had also agreed to open half an alley on the north side of the subdivision. It is also averred that *Morris* never intended to open said streets and alleys, but that the same are enclosed. Testing this averment by the rule that a pleading is to be most strongly construed against the pleader, and it amounts to nothing more than this—that *Morris* had agreed and intended to open a street already dedicated to the public, for, although it is said that the street was to be opened through the land of *Morris*, there is no averment that he was thereafter to dedicate so much of his ground to the public, or that the street was not already public property. In this view of the case, any person interested had a right to insist on opening the street, and could compel the same to be done; and the wrong of *Morris* in keeping it fenced up, is no cause of complaint against *Dunlop* if he had ever promised *Kertz* to open it.

5. That *Dunlop* represented that he had sold seven lots to *Thomas Records*. How this could have enhanced their value in the eyes of *Kertz*, it is hard to perceive, for if not sold to *Records* they were to somebody else, as the complaint shows that one hundred and five lots were sold, which was all there were.

6. That *Dunlop* fraudulently represented the lots to be worth the price *Kertz* agreed to pay for them, and that they were, in fact, worth but 100 dollars. The complaint shows that *Kertz* lived in the city of *Indianapolis;* he had the opportunity then of acquainting himself with their value, and no action would lie, under such circumstances, for an affirmation of value, though the statement might be too high.

As to the offer of plaintiff to rescind, and the time of the offer:

1. He had discovered the falsity of some of the representations in *September*, 1855, four months after his purchase, but which ones, he does not say. We have a right to infer that he had discovered the falsity of all which were regarded by him as important. He then demanded a rescission; but he shows that he subsequently waived it, for he made a voluntary payment of one note in *January*, 1856, and of another in that year, before *October*, for at that time suit was commenced on the nine and twelve months' notes.

His next demand for a rescission, was on the 15th of *April*, 1857, more than nineteen months after his first offer, and after four more of the unpaid notes had been reduced to judgment. The first of these judgments was rendered in *October*, 1856, after *Kertz* must have known all the facts in reference to improvements to be made in 1855 and 1856, after a lapse of time to fully inform himself as to the value of the lots, and all other matters of complaint. The

next was in *January*, 1857, after the full expiration of the time within which all these alleged inducements were to have been performed, and yet he makes no defense to the suits.

We maintain that *Kertz* could not thus play fast and loose. If he intended by his offer of a rescission in 1855, to put an end to the contract, he should have stood by it; his subsequent voluntary payment of two of the notes was a clear waiver of that offer. If he designed to claim relief on the ground of the subsequent discovery of the falsity of some of the alleged misrepresentations of *Dunlop*, he should have made a valid complaint, stating which of the representations he had subsequently discovered were false. Some of the statements made, are so obviously no ground of relief, that they should, by averment, have been excluded as the basis of a claim for relief of this character. There being no such averment, the Court cannot presume that these subsequent discoveries did not relate solely to such unimportant particulars; indeed, by the rule already stated, the presumption is, that all the material grounds of relief, if any existed, were discovered before the first effort to rescind. A man who had discovered that he had been deceived as to a part of the inducement to make a contract, would naturally seek at once to ascertain whether he had been deceived as to the residue. In this case, all the facts were easily accessible; all the parties, *Morris* included, resided in *Indianapolis*, and the presumption is irresistible, that all the matters complained of which were material, were known to *Kertz* more than a year before his last attempt to rescind.

But we need scarcely consider the question of presumptions arising from the allegations of the complaint, for it seems to us that its language shows affirmatively that all the matters of grievance set forth, except the value of *Abbett's* lots, were known to *Kertz* in *September*, 1855; for he says, after stating the first offer to rescind, that "In hope that said improvements would be made, and buildings be erected on said subdivision, and that said street and alley, through the land of *B. F. Morris*, would be opened and laid out, he was, during the years 1855 and 1856, delayed from a further offer of rescission of the contract of purchase aforesaid; that at this time there is, so far as he can learn, no prospect or preparation of any improvement upon said subdivision, and that he has but recently, within two weeks, discovered the fraudulent representations as to the value of said lots sold to *Lawson Abbett*."

The new discoveries, then, after 1855, were that *Kertz* had been deceived as to the value of the lots sold to *Abbett*, not as to the price agreed to be paid by *Abbett*, but as to their value. If *Dunlop* represented to *Kertz* that *Abbett's* lots were worth tenfold what they sold for, or even exaggerated the value of the lots purchased by *Kertz* himself, it would be no ground of rescission, as the authorities cited show. Under these circumstances we insist that *Kertz* was too late in offering to rescind in *April*, 1857. If a party rescinds on the ground of fraud, he must do so at once, on discovering the fraud. Nor must he continue to treat as his own, property which came to him by reason of the fraud. 2 Pars. on Cont. 278, 279.—*Gatling* v. *Newell*, 9 Ind. R. 576, and cases there cited.—*Campbell* v. *Fleming*, 1 Ad. and El. 40.

In this case *Kertz* retains the property and ratifies the contract by making payments voluntarily, months after his alleged discovery of part of the frauds practiced upon him. We think it is evident from his conduct, that he anticipated a speculation in the lots, and held off with the intention of availing

himself of any increase of market value which might take place, and if the speculation failed, then to repudiate the contract and recover back what he had paid