## Estep *v.* Larsh.

FRAUDULENT REPRESENTATIONS.—As to what misrepresentations in the sale of property will be deemed fraudulent, see the opinion at length.

PRACTICE—PLEAS IN ABATEMENT.—The defence of another action pending is matter in abatement, and, as a general rule, must be pleaded before defences in bar.

PLEADING—FORMER RECOVERY.—A judgment for costs on sustaining a demurrer to a complaint, where the plaintiff declines to amend, and his action is therefore dismissed, can not be pleaded as a former recovery in bar of a subsequent action for the same cause, unless the record affirmatively show that the merits were decided upon the demurrer.

APPEAL from the *Putnam* Common Pleas.

PERKINS, J.—This suit is upon the same agreement and appraisement as the foregoing suit between the same parties, from the *Wayne* Circuit Court, and is for the second installment therein mentioned. The evidence in the record is contained in a bill of exceptions. We have carefully examined it. It makes this case:

*Larsh* and *Estep* were the joint owners of a saw mill, near *Centerville, Wayne* county, *Indiana,* and had been running the same some eight months or more. The mill had become old and out of repair, and they concluded to rebuild it. They also contemplated erecting a flouring mill in connection with the saw mill, and had dug a race as a commencement of the undertaking. The plan of the saw mill had been agreed upon, and the building partly erected. It had been agreed to put in the "Union Wheel," and the wheel had been brought to the mill. That wheel had been adopted upon the suggestion of *Larsh.* The millwright had charge of the job. At this point, *Estep* and *Larsh* made the trade described in the agreement set out in the preceding case. *Estep* purchased the half of the mill owned by *Larsh,* at a price to be fixed by appraisers. *Estep* knew all about the property he was purchasing; he stood on equal ground with *Larsh.* The appraisers met, *Larsh* and *Estep* being with them. The appraisers told *Larsh,* as seller, to do his best in praising the property, and *Estep,* as purchaser, to do his best in decrying it. It would seem that the appraisers were prepared to duly appreciate representations, and to receive them with proper caution.

According to the evidence, *Larsh* said it was reasonable to suppose the mill, when completed, would cut 2,000 feet of lumber a day, and, in this, *Estep* concurred with him. It was matter of opinion with both of them as to how the thing would perform in future. *Larsh* said it would cost 100 dol-

lars to fill up the race that had been dug, or to dig it, and *Estep* said it would not cost 20 dollars. They got warm over it, and the appraisers told them, says the witness, "to dry up," or they would not make any appraisement in the premises, and we hear no more of representations by either party, nor whether the appraisers valued the race at much, little or nothing, nor whether it really had anything to do with the trade. The property was appraised, and there is no charge of any fraud or unfairness on the part of the appraisers. The mill was subsequently finished under the contract and received by *Estep*. It did not perform as was expected, though *Miller*, the millwright, says the reason why it did not was that the wheel was a little obstructed by a piece of timber; he says the obstruction could have been removed for five dollars, when the wheel would have performed well, and he so told *Estep*, but *Estep* would not allow the obstruction to be removed.

*Estep* now refuses to pay *Larsh*, because of his alleged fraud in representing to the appraisers that the mill would, when completed, cut 2,000 feet of lumber a day, and that it cost to dig, or would cost to fill up, the mill race, 100 dollars.

We can not discover, from the evidence, any ground for charging the least attempt at fraud upon any one concerned in the transaction. *Estep* purchased the property of *Larsh*, and agreed to take it at a price to be fixed by certain third persons, and *Larsh* sold upon these terms, and we do not see where, up to this point, there was any fraud. It is difficult to perceive how *Larsh* could have perpetrated a fraud on *Estep* in agreeing to sell him his half of the parcel of joint property of which both were then, and for a considerable time had been, in the possession and use, at a price to be fixed by disinterested persons. The third persons provided for, fixed the price. Now, both parties are bound by the price thus fixed, if there is nothing to vitiate the action of the ap-

praisers, but error of opinion as to value. *The Board of Trustees, &c.* v. *Cokely*, 5 Ind. 164.

The case appears to us so clear upon the evidence, that we might disregard the instructions. We have, however, examined them. Objection is made to two instructions. One in which the Court told the jury, that representations, by *Larsh* to *Estep*, touching the property, must have been knowingly false to be fraudulent; and another, in which he applied the same rule to those made by *Larsh* to the appraisers. These instructions must be considered as applicable to the evidence in the cause. That evidence, so far as these instructions had any applicability to it, was the statement of *Larsh*, that the mill, completed and run with the Union wheel, might be expected to cut 2,000 feet of lumber a day. We say this is the evidence, because counsel, in their briefs, do not pretend to rely upon the statement about the mill race. Now, certainly, as applicable to this evidence, the instructions could not be wrong. The parties were building a mill upon a plan agreed upon between them. They adopted a wheel according to their best judgment. There is nothing tending to show design in *Larsh* on this point. The mill was not completed, had not operated. It was an experiment. Both parties appear, by the evidence, to have had equal means of conjecturing and judging. The matter spoken of was not an existing fact, but a future probability. It does not appear that the plan of the mill was proposed by *Larsh*. Now, surely, if a party could make fraudulent representations in such a case, which we do not admit, they must consist not in expressing an erroneous honest opinion, but in expressing knowingly an erroneous one. See *Jenkins* v. *Long*, 19 Ind. 28. There is nothing showing recklessness on the part of *Larsh*. That it may be seen whether we have rightly stated the evidence, we copy all that was said by *Larsh* to the appraisers.

*Andrew Hunt,* one of the appraisers, says: "I don't think Mr. *Larsh* said particularly what the mill would do. During the time the appraisement was being made, it was said that it would be reasonable to suppose the mill would cut two thousand feet a day. *Estep,* as well as *Larsh,* so supposed. I supposed so, because a good saw mill will do that."

*David Commons,* another of the appraisers, says: "*Estep* and *Larsh* both thought it would be a first-rate mill. The frame-work of the mill was good. My understanding was, that it would cut 2,000 feet a day. A little over 100 dollars would have removed all defects, afterwards discovered in the running of the mill, and made the mill run well."

*John W. Estep,* the defendant below, now appellant, says: "*Larsh* spoke confidentially, that the mill, when finished, would cut 2,000 to 2,400 feet of lumber a day."

*Enoch Raileback,* one of the appraisers, says: "When we made the appraisement, the wheel was there before us; the mill was not finished. The mill wright described to us what was to be done to finish it. He was acting under the directions of *Larsh* and *Estep.* We were three days in examining and appraising. *Larsh* and *Estep* were present. The parties said it was thought the mill would cut about 2,400 feet of plank in a day, or in twenty-four hours. *Larsh* had great confidence in the Union wheel. *Estep* not so much. *Larsh* said to *Estep,* when the appraisement was being written, that he would guaranty it to cut 2,400 feet a day, if he, *Estep,* would allow extra if it went over that. This *Estep* would not do, and the subject dropped. *Larsh* made the above proposition to *Estep,* in reply to a request upon him by *Estep,* to warrant the mill to cut a certain amount. This was between *Larsh* and *Estep.*"

*Benjamin Miller* says: "That *Larsh* said, at the appraisement, that if the Union wheel worked as well as the agent represented, the mill would cut 2,000 feet a day."

*Le Roy M. Larsh* says: "He explained the sources of his information about the wheel, and did not pretend to know anything of his own knowledge; supposed it would cut two thousand feet, if it proved to work as well as recommendations certified. *Estep* knew all that he did about it. Never made any warranty in the trade."

Such is substantially the evidence of the statements to the appraisers, and we see nothing in them proving fraud on the part of *Larsh.*

It is well settled, as a general proposition, that expression of opinion, as to utility, service, &c., is not a representation of a material fact. This principle often comes up in cases of the sale of patent rights, &c. See *Gatling* v. *Newell,* 9 Ind. 572, and cases cited. And in cases of stock procured to be subscribed in corporations. *Anderson* v. *The New Castle, &c., Company,* 12 Ind. 376, and cases cited.

As to what representations will amount to fraud; as to whether the party making them must believe them to be false; or only not know that they are true; and as to when the party to whom they are made may rely on them, though he has the means of ascertaining their falsity; and whether there is any difference, in these respects, between contracts touching personal and real property, are points not involved in the case made by the record before us, and we shall not, therefore, discuss them; but for future convenience, we cite some pertinent authorities upon them, apparently not easily reconciled. 2 Par. on Cont. 281, 282; Chit. on Cont. 589; *Taylor* v. *Ashton,* 11 M. & W. 415; *Hazard* v. *Irwine,* 18 Pick. 85; 3 Story's C. C. R. p. 733; *Belknap* v. *Sealey,* 14 N. Y. Ct. of App. 143; *Haight* v. *Hoyt,* 19 *id.* 464; *Bennett* v. *Judson,* 21 *id.* 238; *Hoe* v. *Sanborn, id.* 552; *Kertz* v. *Dunlop,* 13 Ind. 277; *Zehner* v. *Kepler,* 16 *id.* 290; *Matlock* v. *Todd,* 19 *id.* 130. These cases, with the references found in them, furnish an

ample source from which to draw legal information on the subjects suggested.

After the cause had been to the Supreme Court, and returned to the 'Common Pleas reversed, the defendant answered anew. He filed the general denial, and a paragraph of prior action pending, and, also, one of former judgment recovered.

Prior action pending is matter in abatement, and, as a general rule, must be answered before the general denial is filed. *Kenyon* v. *Williams*, 19 Ind. 44. In a note to 1 Chit. Pl. p. 456, it is said: "Pleas in abatement can not be put in after pleas in bar, unless under special circumstances, of which the Court must judge. *Biddle* v. *Stevens*, 2 Serg. & R. 537; *Palmer* v. *Evertson*, 2 Cowen 417; *Ripley* v. *Warren*, 2 Pick. 593," and several other cases.

Former judgment recovered for the same cause of action is matter in bar; and the question in this case is, therefore, whether the answer of such judgment, in this case, was a valid one. The former judgment set forth in the answer was one against the plaintiff, for costs on, as is said, a demurrer being sustained to his complaint. The demurrer is not in the record set out in the answer, and we do not know, therefore, the cause assigned for demurrer, but the ruling of the Court was, if we may believe the Clerk, that the demurrer was sustained, and leave given the plaintiff to amend. The plaintiff declined to amend, and, on motion, his motion for aught we know, judgment for costs was rendered against him, the cause going out of Court. So far as the record legally shows anything, it shows a dismissal. This was not a judgment that would bar another action. The appellant cites Bacon's Abr. Tit. Pleas and Pleading, N. 4, to show that a final judgment may be rendered upon demurrer that will bar a subsequent action for the same cause. And the case of *Bouchand* v. *Dias*, 3 Denio, 238, is to the same effect.

We do not doubt this, but it must appear that the merits were decided. Says Judge *Story*, in *Eilman* v. *Rives*, 10 Pet. 298: "A judgment that a declaration is bad in substance, can never be pleaded in bar to a good declaration for the same cause of action. Such a judgment is, in no just sense, a judgment upon the merits." See, also, *Stevens* v. *Dunbar*, 1 Blackf. 56. See, also, 6 Blackf. 56.

Now, in the case at bar, we know that the Court decided, that the plaintiff should amend his declaration, and that the cause went out of Court at the plaintiff's costs; but whether upon some point of form, or otherwise, we know not. We do not know, from the showing of the answer of former recovery, what was decided in the judgment of former recovery pleaded. We take it that such a judgment can, in no just sense, be held to be a judgment upon the merits.

One other point is made. It is contended that the appraisement made is void for this reason, viz: the agreement that an appraisement should be made was entered into on the 13th of *December*, 1851, and provided that it should be made subject to the back water then on the property. The appraisement was made on the 26th of *December*, 13 days after the agreement, and was made subject to the back water, following the language of the agreement, "now on the property." It is contended that the appraisement should have been made, subject to the back water on the property, on the 13th, instead of the 26th of *December*. The parties were both present when the appraisement was put in writing, and neither of them objected to the manner in which it was drawn on this point, and we think there was no ground for objection. It was not meant, of course, that the appraisers should appraise the property subject to the particular water that was on it on the 13th, because that would have disappeared before the appraisers could reasonably be expected to be notified and visit the property. Yet this is the literal agreement. We

must then go to construction to determine its meaning. Was it that they should appraise it subject to an amount of water equal to what was on the property on a single given day, viz: the 13th of *December*, 1851 ? What reason could there be for such a construction? *Estep* was buying the property for use in all time to come, on all days, and every day. Of what consequence was it, then, as to the water on it, at a given day? We think the spirit of the agreement was, that the property should be appraised subject to its liability to back water, as then situated, considering the dam, embankment, &c.

*Per Curiam.*—The judgment is affirmed, with 5 per cent. damages and costs.

*David McDonald* and *John S. Newman,* for the appellant.
*James Perry, J. B. Julian* and *I. F. Julian,* for the appellee.